# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

RYAN B.,

                                        Plaintiff,

          v.                                        6:19-CV-1448
                                                    (ATB)

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                                        Defendant.

---

B. BROOKS BENSON, ESQ., for Plaintiff
AMELIA STEWART , Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4,7).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed applications for Social Security Disability Insurance

Benefits ("DIB") and Supplemental Security Income on November 24, 2015, alleging

disability beginning on June 1, 2014 due to a learning disability, carpal tunnel

syndrome, and "lower back problems."[1] (Administrative Transcript ("T.") 79-81).

Plaintiff's claims were denied initially on March 16, 2016. (T. 79-80).  Plaintiff made a

---

[1] At his administrative hearing, plaintiff amended his onset date to December 10, 2015. (T. 27).
Plaintiff suffered a stroke on December 18, 2017, and the effects of this additional impairment have
been included in the administrative record as discussed below.

timely request for a hearing, which was ultimately held by videoconferencing on June 12, 2018[2] before Administrative Law Judge ("ALJ") Yvette N. Diamond.  (T. 24-78). ALJ Diamond heard testimony from plaintiff and from Vocational Expert ("VE") Jennifer Guediri. (*Id.*)  On July 11, 2018, ALJ Diamond issued an unfavorable decision. (T. 106-119).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 19, 2019. (T. 1-5).

## II.   **GENERALLY APPLICABLE LAW**

### A.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

---

[2] Plaintiff appeared for a hearing on January 30, 2018, but the hearing was adjourned so that plaintiff could obtain counsel. (T. 13-23).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  It must be "more than a scintilla" of evidence scattered throughout the

administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  <u>FACTS</u>

Plaintiff was born on August 16, 1979 and was 38 years old at the time of the ALJ hearing. (T. 31).  Plaintiff was single and lived alone in an apartment. (*Id.*)  Plaintiff testified that he finished the 11th grade, taking special education classes, and never achieved his GED. (T. 32).  He testified that he could not read or write. (*Id.*)

Plaintiff's previous work was doing auto body and paint work. (T. 36-38).  He last worked in 2013 or 2014 for Brian's Body Services. (T. 37-38).  Plaintiff testified that he stopped working because he was laid off, but it coincided with the time that his back was "just getting worse." (T. 38).

Plaintiff testified that he had not worked since that time because his back hurt too much to walk around, and he had never applied for a desk job because he could not read or write. (T. 38).  In addition to his inability to read and write, plaintiff testified that he believed that he was unable to work due to his back, his legs, his hands, and "everything." (T. 39).  The ALJ asked plaintiff about a note in the record indicating that plaintiff had been in a "fist fight" the year before the hearing and had broken his wrist. (T. 39).  Plaintiff testified that the fight occurred in the parking lot of a grocery store when plaintiff ran into someone he knew, and that person "swung at" him.  Plaintiff stated that he was only defending himself. (T. 39).

Plaintiff testified that since his amended alleged disability onset date, he was hospitalized for a stroke in December of 2017 and for gastrointestinal bleeding in March and April of 2018. (T. 39-40).  Plaintiff changed treating primary care providers four months prior to the hearing. (T. 40-41).  Plaintiff was treating with Paula Vecchio, M.D., but could not remember the names of other physicians or other medical personnel with whom he had treated. (T. 41-42).  When asked about his psychiatric impairments, plaintiff stated that he only took his medications "sporadically," when he felt a panic attack coming on, and he could not remember the name of the provider who prescribed his psychiatric medication. (T. 41-42).

The ALJ questioned plaintiff about his lack of cooperation with his former treating provider, who counseled him to stop drinking and smoking. (T. 43-44). When plaintiff failed to do so, according to the record, it caused his gastrointestinal bleeding in March of 2018.[3] (T. 43-44). Plaintiff stated that he switched primary care providers because he "got fed up" with them asking him to come in every week for blood tests. (T. 43). At the time of the hearing, plaintiff was only taking a baby aspirin as a "blood thinner" for stroke prevention and his psychiatric medications "as necessary." (T. 45-46). Plaintiff testified that the doctor took him off the stronger blood thinner because plaintiff was a Jehovah's Witness and refused to have blood transfusions, so the doctor was trying to avoid any bleeding problems. (*Id.*)

Plaintiff testified that he could attend to his own personal needs, house cleaning, and laundry, but did not do yard work for himself or anyone else.[4] (T. 47-48). He testified that he wore a wrist brace at night because of his carpal tunnel syndrome. (T. 46). Plaintiff stated that he had a driver's license, but did not own a car and took public transportation when he wanted to go somewhere. (T. 48). He took the bus to run errands and prepared his own meals. (T. 49). Plaintiff could walk "a couple" miles if he stopped every "couple" blocks to rest his legs. (T. 49).

---

[3] At that time, plaintiff was also smoking two packs of cigarettes per day and taking anti-inflammatory medication. (T. 44). The ALJ asked about plaintiff's drinking and smoking, and plaintiff stated that he stopped drinking and smoking excessively after the stroke, which did not explain the gastrointestinal bleeding three months after the stroke due to the combination of alcohol, smoking, and anti-inflammatory medication. (T. 45-47).

[4] The ALJ questioned plaintiff about the notation in the record, indicating that plaintiff hurt himself "in the last year or so," doing auto repairs for someone else. (T. 48). Plaintiff stated that he did not know what the ALJ was talking about. (*Id.*)

Plaintiff testified that he would occasionally go out socially with friends to get something to eat or go to a movie. (T. 49-50).  Occasionally, plaintiff got a ride to, and stayed at his sister's home. (T. 50).  He studied his religion with a friend for an hour once per week, and stated that he did not attend sports events because he did not have the money for it. (T. 50).  Plaintiff told the ALJ that "a couple" summers prior to the hearing,[5] he went to North Carolina on vacation by himself on the bus. (T. 51).  He saw his brother there, and he went to the beach a few times. (*Id.*)  Sometimes, one of plaintiff's friends picked him up and took him for a ride to Sylvan Beach so that he could get out of the city. (T. 51-52).

Although plaintiff testified that he did not have any hobbies, he also stated that he enjoyed music and liked to watch television. (T. 52).  He does not use social media or read books because he cannot read.[6]  He does not follow sports, but would go to a car show if there were one held locally. (T. 52).  Plaintiff stated that he got up at 6:00 or 7:00 in the morning, ate breakfast, and watched TV if he did not have a doctor's appointment scheduled. (T. 53).  If plaintiff had a medical appointment, sometimes Cliff Franklin[7] would come along to help him with the paperwork because of his

---

[5] This trip would have occurred in 2016 because the hearing was in June of 2018.

[6] Plaintiff testified that he could recognize small words like "the" or "cat," but could not write a full sentence. (T. 56).  He could "do a little math." (T. 55).

[7] Clifford Franklin, II accompanied plaintiff to the January 2018 hearing. (T. 16).  Mr. Franklin works for the Resource Center for Independent Living in Utica, New York. (*Id.*)  He was a caseworker assigned to the plaintiff. (T. 55).  He accompanied plaintiff to the January hearing as his "representative," but there was no paperwork filed prior to the hearing to support the appointment, Mr. Franklin had never appeared as a representative at a Social Security Hearing, and the hearing was adjourned so that plaintiff could hire an attorney. (T. 16-18).

inability to read and write. (*Id.*)  Before Mr. Franklin, plaintiff's sister helped him read documents and helped him complete the paperwork for his driver's license. (T. 55).

Plaintiff estimated that he could lift up to 50 pounds, sit for one or two hours at a time before he needed to get up and move around, and could walk approximately five minutes before he had to rest. (T. 53-54).  Plaintiff also testified that he could carry a dish from the table to the sink or the counter to the table. (T. 54).  Plaintiff testified that his problems walking predated the stroke, that he had muscle spasms at night, and that his calves would hurt when he was walking so that he had to sit down and rest every two blocks. (T. 58).

Plaintiff testified that, after the stroke,[8] he also had numbness and pain in both hands.  He stated that the pain was intermittent, but the numbness was constant. (T. 58).  When he had pain, it felt as if it were ripping the tendons out of his hands. (*Id.*)  Plaintiff testified that "sometimes [he] drops stuff," like water bottles or soap in the shower. (T. 59).  He stated that his hands hurt every time he made fist. (*Id.*)

Plaintiff testified that his doctors at Upstate Medical Center told him that he likely had strokes prior to 2017, and it was possible that he could suffer more strokes in the future. (T. 59-60).  Plaintiff stated that his back pain comes and goes, but it is unbearable when he has it. (T. 61).  Plaintiff testified that his back pain was worse lying in bed too long, doing everyday things, riding in a car, standing, lifting, pushing, and

---

[8] Later in his testimony, plaintiff stated that he always had pain and numbness in his hands, and that these symptoms pre-dated the stroke. (T. 60).  The condition merely got worse after the stroke. (*Id.*)

pulling.[9] (T. 61-62).  Plaintiff stated that his fatigue would require him to lie down for approximately one to three or four hours, two or three times per day. (T. 63).  Plaintiff also testified that he sometimes would lie down because of the pain. (T. 63).  Plaintiff testified that he needed to lie down frequently during the day even before the stroke, but after the stroke, he needed to rest for longer periods of time. (T. 65).   He stated that the "medications" he is on because of the stroke cause him to have urinary frequency and "diarrhea all the time." (T. 64).  He must stay close to a bathroom because he had to urinate at least twice per hour and had diarrhea every hour. (*Id.*)

Plaintiff testified that although he cannot read, he can read dollar amounts and knows which bills need to be paid. (T. 65-66).  Plaintiff often took his bills to Mr. Franklin to help him read the documents. (T. 65).  Plaintiff stated that he did not need to read his bills because Social Services pays them, but then stated that he could pay them on his own if he had to. (T. 66).  Plaintiff testified that he had problems with concentration before the stroke, but he believed that the problems were worse after. (T. 67).

The ALJ heard testimony from VE Jennifer Guidieri.  She testified that plaintiff's past work was Automobile-Body Repairer Combination, which could be performed at medium to very heavy levels.[10] (T. 68-69).  The ALJ asked the VE four hypothetical questions.  The first hypothetical assumed an individual of plaintiff's age, education,

---

[9] Plaintiff did not spontaneously make these allegations.  Counsel was reading the plaintiff's physical therapist's notes and asking plaintiff whether he agreed with the statements. (T. 60-61).

[10] VE Guidieri testified that, based on plaintiff's testimony, his prior relevant work was performed at a medium level of exertion. (T. 69).

and prior work experience who could lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for six out of eight hours, sit for six out of eight hours, frequently climb stairs, balance, stoop, kneel, crouch, and crawl, but cannot climb ladders. (T. 69).  The individual may not have concentrated exposure to extreme heat, vibration, or hazards. (*Id.*)  The individual would be limited to simple, routine tasks that are not fast-paced and that have no strict production demands. (*Id.*)  Finally, the hypothetical individual is limited to low-stress work, which is defined as having occasional decision-making and occasional changes in the work setting. (*Id.*)

The second hypothetical question assumed the facts of the first hypothetical and added that the individual would require oral instructions because he could not read. (T. 70).  The third hypothetical question assumed the limitations listed in the first two questions and added that the individual would be required to change positions from sitting to standing, where he could stand and walk for half an hour and then sit for five to ten minutes while remaining on task. (T. 71).  The fourth and final hypothetical added a further limitation that the individual was limited to "frequent" handling and fingering. (T. 72).

Based on the first hypothetical, the VE testified that plaintiff could not perform his past relevant work, but could perform the work of a bagger, sorter of small items, and hand filler. (T. 69-70).  All these jobs were unskilled, light work. (*Id.*)  The VE testified that the number and type of jobs would not be affected by the limitations that the ALJ added in the second and third hypotheticals as long as the individual could remain on task while alternating between standing and sitting. (T. 71-72).  With respect

to the handling and fingering limitation from the fourth hypothetical question, the VE testified that the "bagger" position would be eliminated because it required more "constant" fingering, but it could be replaced by an assembler of small parts job. (T. 72-73).  The VE testified that employers would generally tolerate one unexcused or unscheduled absence per month, and would not tolerate an employee being more than 10% off task in addition to his or her regularly scheduled breaks. (T. 73).  The VE also stated that her information was consistent with the Dictionary of Occupational Titles ("DOT"), but that the sitting/standing requirement and the absentee/off-task tolerances were based on twenty years of experience in vocational counseling, personal observation, and interviews with employers. (T. 73-74).

In response to cross-examination by plaintiff's counsel, the VE testified that if the individual were limited to only "occasional" as opposed to "frequent" handling, this limitation would rule out the sorter, bagger, and small assembler jobs. (T. 76).  The VE also testified that if the individual were required to lie down for ten minutes every hour to relieve pain, this restriction would eliminate all work. (*Id.*)  At the end of the hearing, the ALJ stated that she would keep the record open for any further medical evidence that plaintiff wished to submit. (T. 77).

There are a substantial number of relevant medical records in the file.  However, rather than summarizing the medical records at the outset, I will refer to the pertinent records and proceedings during my discussion of the plaintiff's arguments.

## IV.   THE ALJ'S DECISION

The ALJ found that plaintiff met the insured status requirements through March

31, 2019 for purposed of DIB and had not engaged in substantial gainful activity ("SGA") since his amended onset date of December 15, 2015.  The ALJ then determined that plaintiff had the following severe impairments at step two of the sequential evaluation: degenerative disc disease, carpal tunnel syndrome ("CTS"), anemia, status-post cerebrovascular accident ("CVA" or "stroke"), learning disorder, major depressive disorder, and generalized anxiety disorder. (T. 108-109).  The ALJ also found at step three of the sequential evaluation that none of the plaintiff's severe impairments, alone or in combination, met or medically equaled the severity of Listed Impairments.[11] (T. 109-111).

At step four of the evaluation, the ALJ determined that plaintiff physically had the RFC to perform light work, with the following limitations: plaintiff could lift 20 pounds occasionally and ten pounds frequently; stand and/or walk for six out of eight hours and sit for six out of eight hours. (T. 111).  The plaintiff would also be able to frequently climb stairs, kneel, stoop, balance, crouch, and crawl, but could not climb ladders. (*Id.*)  Plaintiff could "frequently" handle and finger, but required the option to stand for thirty minutes and then sit for five minutes as needed throughout the day, while remaining on task. (*Id.*)  The plaintiff could not have concentrated exposure to extreme heat, vibrations, or hazards. (*Id.*)

Mentally, the plaintiff would be limited to simple, routine tasks that are not fast-paced and do not have strict production demands.  The ALJ concluded that plaintiff was able to perform low-stress work, which is defined as work involving only occasional

---

[11] There is no argument that plaintiff is disabled at step three; thus, the court will not explain the ALJ's rationale in detail at this step of the evaluation.

decision-making and occasional changes in the work setting. (T. 112).  The plaintiff would be able to perform tasks with oral instructions or by instruction by demonstration, but was unable to read, and was limited to simple mathematical calculations. (*Id.*)

In making this determination, the ALJ reviewed plaintiff's testimony as well as the medical evidence of record, detailing plaintiff's emergency room records, hospitalization records, treatment records, including evidence of his 2017 stroke, with all of its subsequent affects on plaintiff's abilities. (T. 113-15).  The ALJ then determined the weight to be given to the opinion evidence. (T. 115-17).  The ALJ gave "partial" weight to the 2016 consultative evaluation conducted by Dr. Brian Cole, M.D. (T. 115) (citing T. 352-57).  The ALJ gave "little" weight to the June 5, 2018 stroke medical source statement ("MSS") written by Dr. Ramesh Cherukuri, M.D. and little weight to the MSS written by Dr. Kenneth Visalli, D.O., plaintiff treating primary care provider. (T. 115-16) (citing T. 1068-72, 1190-97).  With respect to plaintiff's mental capabilities, the ALJ gave "great" weight to S. Juriga, Ph.D., a non-examining physician and "partial" weight to the consultative opinion written by examining psychologist, Katie Lewis, Ph.D. (T. 116-17) (citing T. 92-100, 346-50).  The ALJ detailed her reasoning for the weight that she gave to the individual providers, and in fact, noted some additional mental limitations based upon "new evidence submitted at the hearing level." (T. 116).

Based on the above RFC, the ALJ found that plaintiff could not perform any of his past relevant work. (T. 117).  However, given the VE's testimony, plaintiff would

be able to perform three representative jobs in the national economy, notwithstanding his additional limitations placed on his ability to perform a full-range of light work and his inability to read and write. (T. 118).  Thus, the ALJ found that plaintiff was not disabled from his alleged date of onset, through the date of the ALJ's decision.

## V.   ISSUES IN CONTENTION

Plaintiff raises several arguments in support of his position that the ALJ's decision is not supported by substantial evidence:

1.   The ALJ failed to properly weigh the medical evidence in determining plaintiff's RFC, including the opinions of Dr. Vasalli, Dr. Cherukuri, and Dr. Cole. (Plaintiff's Brief ("Pl.'s Br.") at 13-23 - Points I-III) (Dkt. No. 13).

2.   The ALJ failed to properly consider plaintiff's pain and subjective complaints. (Pl.'s Br. at 24-25 - Point IV).

3.   Because the ALJ's RFC determination was not properly supported, the hypothetical question was improper, and the step five determination was not supported by substantial evidence. (Pl.'s Br. at 25 - Point V).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 5-19) (Dkt. No. 19).  For the following reasons, this court agrees with the defendant and will recommend affirming the Commissioner's decision.

## VI.   RFC/WEIGHING EVIDENCE

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

14

activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2.    Weight of the Evidence/Treating Physician

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v.*

*Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)).  "[T]he ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32).  Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error.  *Id.*  It is impossible to conclude that the error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

### B.    Application

#### 1.    Dr.Visalli

Plaintiff first argues that the ALJ failed to give "controlling" weight to the opinion of Dr. Kenneth Visalli, D.O., plaintiff's treating primary care provider.  The ALJ gave Dr. Visalli's MSS "little weight." (T. 116) (citing T. 1190-97).  The ALJ noted that Dr. Visalli's MSS would indicate that the plaintiff could perform a "reduced" range of sedentary work, could only "occasionally" use his hands, would need frequent breaks throughout the day, and would be off-task at least 25% of the time. (T. 116).

17

The ALJ stated that Dr. Visalli's MSS was inconsistent with his own examination of the plaintiff in June of 2018, finding that plaintiff had normal grip strength and sensation bilaterally. (T. 116) (citing T. 1188-89).  The ALJ also relied on the following statement by Dr. Visalli in his June 21, 2018 MSS:

> On my exam, his strength is intact in his hands and legs, but this is only a brief examination. Given his complaints, it seems unlikely that he can maintain this strength for a normal work environment.

(T. 1193).  The ALJ stated that "given this opinions [sic] inconsistency with his own examination findings, *as well as [] being unsupported by the other objective evidence in the record*, I give this opinion little weight." (T. 116) (emphasis added).

Plaintiff began seeing Dr. Visalli on March 20, 2018.[12] (T. 814-16).  Dr. Visalli saw plaintiff twice more before he wrote the MSS: once on April 13, 2018, and the day that he wrote the MSS on June 21, 2018. (T. 1186-89).  Plaintiff argues that by citing "inconsistency" within Dr. Visalli's own treatment notes, the ALJ was substituting her lay judgment for competent medical opinion.  This court disagrees.  In *Ramsey v. Comm'r of Soc. Sec.*, No. 19-3306, __ F. App'x __, 2020 WL 6372994, at *1 (2d Cir. Oct. 30, 2020), the court upheld an ALJ's determination when, rather than "forge his own medical opinions based on raw data or reject diagnoses provided by medical professionals," the ALJ "accurately summarized medical notes and opinions . . . ." *Id.* It is not error to discount the treating physician's opinion "citing contradictory notes or other medical opinions," and explaining the reasons for doing so. *Id.* (citing *Veino v.*

---

[12] Plaintiff transferred his care to Dr. Visalli's practice on March 20, 2018 from his previous primary care provider Dr. Paula Vecchio, M.D. (T. 814).

*Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (noting that it is "within the province of the ALJ to resolve" conflicting findings)).  This is exactly what the ALJ did in this case.

Even assuming that Dr. Visalli qualified as plaintiff's treating physician, given that he only saw the plaintiff three times before he wrote his MSS, the ALJ is directed to consider the consistency of the opinion with the doctor's own treatment notes and other evidence of record. *Ramsey, supra*.  In the June 2018 MSS, Dr. Visalli qualified his opinion by stating that, on his examination, plaintiff's strength was intact in his hands and legs, but then stated that it was only "a brief examination."[13]  However, Dr. Visalli had seen plaintiff twice before.  On March 20, 2018, he noted that plaintiff was a "poor historian," and that he had some "strange sensation in his hands." (T. 814).  Upon physical examination, plaintiff had normal gait, no obvious focal neurological deficits, his speech was clear, there was no swelling in his joints. (T. 815).

On April 13, 2018, Dr. Visalli stated that plaintiff was feeling a lot better, and that although he was complaining of "some" numbness in his hands, "he has been rather lucky from the strokes and does ***not have any significant residual deficits***." (T. 797) (emphasis added).  Plaintiff's gait and station were normal, and his "digits and nails" were normal. (T. 798).  He had normal cranial nerves, with no focal deficits. (*Id.*)  Although plaintiff had some numbness noted on the left hand, the neurologic exam was

---

[13] Dr. Visalli did note that plaintiff had seen a vascular surgeon recently, but that the opinion was not complete, so it did not contain a specific statement from the vascular surgeon.  However, an ultrasound performed prior to the visit to the vascular surgeon revealed normal findings on the right lower extremity, and on the right, a normal ABI, "but a greater than 50% stenosis in the proximal anterior tibial artery." (T. 1186).  The ankle-brachial index ("ABI') test compares the blood pressure measured at the ankle with the blood pressure measured at the arm. https://www.mayoclinic.org/tests-procedures/ankle-brachial-index/about/pac-20392934.  A low ABI may indicate a narrowing or blockage of the artery in the legs. *Id.*

"otherwise rather normal." (*Id.*)  His strength was "5 out of 5 throughout the upper and lower extremities." (*Id.*)

Finally, on June 21, 2018, the day that he signed an MSS stating that plaintiff could only lift and carry up to 10 pounds, and could only reach, handle, finger, feel, push and pull "occasionally," Dr. Visalli's physical examination found plaintiff had no focal neurological deficits, could move all four extremities "without difficulty," his grip strength was 5/5 bilaterally, his finger to nose testing was normal, his cranial nerves fully intact, and his sensation to light touch was "fully intact" in both arms and hands. (T. 1188).  Plaintiff's leg swelling had completely resolved, and the GI bleeding that plaintiff experienced after his stroke hospitalization had also improved.[14] (T. 1186).  In his MSS, he noted that the neurologist found ataxia[15] in left arm "per their notes." (T. 1193).  Dr. Visalli stated that he did not see the ataxia on his examination, but noted that it was not his specialty. (T. 1193).  Dr. Visalli only saw the plaintiff three times, and each time, he noted full strength, full mobility, and full sensation, notwithstanding some complaints of numbness, and noted that plaintiff did not have "significant residual deficits" from the stroke.

Plaintiff also argues that Dr. Visalli was entitled to rely on plaintiff's subjective complaints, which may have been different than what Dr. Visalli found on his physical

---

[14] Plaintiff was taken off his anticoagulants, and after discussion with his specialist, prescribed aspirin alone "since he is a Jehovah's Witness and the concern was that if he developed any further bleeding he may not be reliable." (T. 1186).

[15] Ataxia is defined as a lack of muscle control or coordination of voluntary movements. https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652

examination.  While in certain circumstances, often in mental impairment cases,[16] the doctor is entitled to rely on a patient's subjective complaints, there are also cases, such as this one, where the ALJ was correct in rejecting the physician's opinion, in part, because it was based on plaintiff's subjective complaints. *See Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (affirming ALJ's determination where the treating physician's "final opinion was inconsistent with his own prior opinions and the findings of the other medical examiners, and was based on [the plaintiff's] subjective complaints"); *Christopher B. v. Saul*, No. 8:19-CV-905 (BKS), 2020 WL 5587266, at *14 (N.D.N.Y. Sept. 18, 2020) (same).  In this case, Dr. Visalli specifically stated that plaintiff's subjective complaints were inconsistent with his own examination, and the ALJ found that the MSS was also inconsistent with other medical evidence in the record.

The ALJ was not "substituting" her opinion by finding that Dr. Visalli's physical examination results and comments were inconsistent with Dr. Visalli's restrictive MSS. Plaintiff himself testified that he could lift 50 pounds. (T. 53).  Plaintiff testified that he could reach into the refrigerator and could carry dishes. (T. 54).  Plaintiff testified that he could sit for one to two hours and walk for five to ten minutes at a time. (T. 54).  Dr. Visalli stated that plaintiff could sit for one hour, stand for one hour, and walk for ten minutes at a time for a total of three hours sitting, four hours standing, and one hour

---

[16] *See e.g. Marcano v. Berryhill*, No. 13-CV-3648 (NSR/LMS), 2017 WL 2571353, at *17 (S.D.N.Y. Mar. 29, 2017) (citing inter alia *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (finding that reliance on subjective complaints does not undermine the doctor's opinion regarding functional limitations because "[a] patient's report of complaints, or history, is an essential diagnostic tool.")).

walking. (T. 1192).  In her RFC determination, the ALJ allowed for plaintiff to stand for 30 minutes and then sit for five minutes "as needed" throughout the day while remaining on task, in addition to regular breaks.[17] (T. 111).

The plaintiff began seeing Dr. Visalli in March of 2018, and he is claiming disability beginning in December of 2015.  Thus, the ALJ was entitled to analyze findings and reports prior to Dr. Visalli's first examination in 2018 and prior to plaintiff's stroke in December of 2017.  These previous reports found that plaintiff had normal gait, could squat fully, could walk on his heels and toes, had full range of motion, and normal strength, sensation, and reflexes. (T. 113) (citing T. 352-56 (consultative opinion (Dr. Cole) February 2016); 512-13 (Dr. Vecchio, plaintiff's former treating internist); 833-46 (emergency room records - low back pain, but no numbness or weakness in the lower extremities); 1169 (evaluation by NP Corey Burgess - normal strength, normal range of motion, notwithstanding back pain)).  While not all of this medical evidence was discussed in the section of the ALJ's opinion which analyzed the "weight" that she gave to the opinion evidence, she cited this medical evidence in other sections of her opinion.

Plaintiff argues that the ALJ should have obtained "further" medical evidence from vascular[18] surgeon Dr. Ankur Chawla, M.D., who plaintiff first saw on June 13, 2018, the day after the ALJ's hearing, and whose report was discussed by Dr. Visalli in

_____

[17] It is unclear whether Dr. Visalli would have had the same opinion regarding plaintiff's ability to be "on task" if he knew that the RFC included the ability to take breaks "as needed" throughout the day.

[18] Plaintiff's brief refers to Dr. Chawla as a neurosurgeon.  (Pl.'s Br. at 17).  However, the medical records refer to him as a vascular surgeon. (T. 1183).

his June 2018 treatment notes. (T. 1183-85).  Dr. Chawla was consulted, in part, to review an arterial duplex test of plaintiff's lower extremities that was performed on May 17, 2018. (T. 1181-82).  However, Dr. Chawla never commented on the test in his June 13, 2018 notes, which indicate at the top that they were "preliminary." (T. 1183). The arterial duplex test report states that in plaintiff's right leg, there was less than 50% stenosis in six of the arteries tested, and more than 50% stenosis in the proximal anterior tibial artery. (*Id.*)  However, the ABI at rest was normal, even on the side showing stenosis. (*Id.*)

Dr. Visalli discussed Dr. Chawla's report, and its failure to specify any opinion about plaintiff's claudication symptoms in his June 21, 2018 treatment notes. (T. 1186). Plaintiff argues that the ALJ should have contacted Dr. Chawla to determine what the effect of the arterial stenosis was on plaintiff's ability to work and that the case should be remanded to obtain this additional information.  The court notes that the arterial duplex test that Dr. Chawla was reviewing was taken on May 17, 2018, plaintiff saw Dr. Chawla on the day after the hearing (June 13, 2018), and the ALJ kept the record open for additional medical evidence until June 26, 2018. (T. 77).  Plaintiff submitted the additional records without indicating that they were incomplete.  These additional records include Dr. Visalli's  June 21, 2018 report, discussing Dr. Chawla's "incomplete" report, stating that although the ABI was normal on the right side, there was greater than 50% stenosis, and there were no "specifics" from the vascular surgeon. (T.  1186).  However, Dr. Visalli's report also states that plaintiff was "told" that Dr. Chawla thought that the "claudication-type symptoms might be neurological in

nature."[19] (*Id.*)  Plaintiff argues that the case should be remanded because the ALJ failed to develop the record regarding Dr. Chawla's report.

While it is true that the ALJ has the duty to develop the record even if the plaintiff is represented by counsel as he was in this case, the ALJ fails in this duty only when there are "obvious gaps" in the record. *Eusepi v. Colvin*, 595 F. App'x. 7, 9 (2d Cir. 2014) (summary order).  The ALJ is not required to develop the record further if "the evidence already presented is adequate for [the ALJ] to make a determination as to disability." *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (summary order).

In this case, although it is true that Dr. Chawla did not "complete" his opinion, there was ample time to add that opinion to the record.  As stated above, notwithstanding plaintiff's impairments and claim of problems walking, as cited above, every examination, including Dr. Visalli's June 21, 2018 report, indicated that plaintiff's strength and sensation were almost completely intact. (*See* T. 1188).  It also appears from Dr. Visalli's June 21, 2018 report that the etiology of plaintiff's claudication symptoms was unclear. (T. 1186, 1188, 1189).  To the extent that this condition might affect the plaintiff's future abilities, it is not relevant to the ALJ's decision herein.[20]  Thus, the ALJ's consideration of Dr. Visalli's MSS was supported by

---

[19] Dr. Visalli also cited to plaintiff's degenerative disc condition, noting that the limping condition could be caused by his back impairment. (T. 1186).

[20] The court notes that on September 29, 2017 (prior to plaintiff's stroke), he was examined by Corey Burgess, N.P. (T. 1168-70).  Plaintiff was referred to NP Burgess by Leo Patrick Sullivan, M.D., from Surgical Associates of Utica. (T. 1168).  NP Burgess reviewed plaintiff's history and stated that plaintiff complained of back pain and cramping in his legs while walking. (*Id.*)  NP Burgess stated that plaintiff was initially seen by Dr. Sullivan for a vascular "eval." which was negative. (*Id.*)  On August 17, 2017, a report, authored by a provider from Surgical Associates of Utica states that plaintiff's ultrasound was negative for Deep Vein Thrombosis ("DVT"), and he had "excellent" pulses in his feet.

substantial evidence.

### 2.    Dr. Ramesh Cherukuri

Plaintiff argues that the ALJ failed to give Dr. Cherukuri's MSS the appropriate weight, even though at the time he wrote the "Stroke MSS," he had only examined the plaintiff once on May 2, 2018.  The ALJ gave Dr. Cherukuri's MSS "little weight," including the finding that plaintiff would be limited to less-than-sedentary work, would be off task 15% of the time, and would be absent more than 4 days per month. (T. 114-15).  Dr. Cherukuri is a neurologist.  However, having seen the plaintiff only once, it is questionable that Dr. Cherukuri would have been considered a treating physician at the time that he completed the form report in June of 2018. *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (physician who sees a patient only once or twice does not have a chance to develop an ongoing relationship with the patient and thus is generally not considered treating physician) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)).  The ALJ correctly considered the doctor's limited contact with the plaintiff. *Burgess, supra.*  The ALJ stated that, at the one examination conducted by Dr. Cherukuri, plaintiff reported calf pain, but denied any residual problems from his stroke, and apart from "mild left hand ataxia on finger-to-nose testing, the examination was otherwise normal. (T. 115).  The ALJ also stated that the MSS was inconsistent

---

(T. 473).  The note stated that "I think his problem is mostly neurogenic." (T. 473).  There is no signature under the notation "seen by." (T. 474).  There is a subsequent note, dated August 2, 2017 by LPN Marguerite Spano, but it appears to be a "nurse's note" from the same day. (T. 475).  It is safe to assume that the medical evaluation was conducted by Dr. Sullivan.  Dr. Sullivan ordered an MRI in this case, which was done on August 31, 2017. (T. 467-69).  In any event, the August 17, 2017 report shows that a *vascular* evaluation prior to the 2018 evaluation was negative.  This further supports the finding that there was sufficient evidence in the record for the ALJ to make her determination.

with the other "grossly normal" findings that the ALJ discussed earlier in her opinion.

As stated above, the record contains substantial evidence supporting the "grossly normal" findings relied upon by the ALJ to give "little weight" to Dr. Cherukuri's MSS.  Notwithstanding complaints of claudication, plaintiff's gait has almost always been considered normal.  A review of Dr. Cherukuri's narrative report shows that upon physical examination, plaintiff's cranial nerves were normal, his gait and station were normal, the strength and tone of his upper and lower extremities were normal bilaterally. (T. 792).  Notwithstanding the "mild" ataxia on finger-to-nose testing on the left side, the strength in one of his hand muscles was 4+/5, and the rest were 5/5. (*Id.*) Heel-to-shin testing was "ok bilaterally." (*Id.*)  In his MSS, Dr. Cherukuri stated that plaintiff would need a job that allowed him to alternate between sitting and standing "at will." (T. 1069).  While the ALJ's RFC did not have an "at will" requirement, she did allow for shifting of positions every 30 minutes. (T. 111).  The ALJ specifically recognized plaintiff's history of degenerative disc disease, carpal tunnel syndrome, anemia, and 2017 stroke, which resulted in the limitation to a "reduced range of light work," including the limited handling and fingering and the ability to shift positions. (T. 113).  However, the ALJ ultimately stated that when considering the "relatively normal findings on objective examination despite the claimant's less than full compliance with even routine and conservative treatment modalities, I find the record does not support any greater limitations." (*Id.*)  The ALJ was entitled to consider the conflicting evidence to give "little" weight to Dr. Cherukuri's MSS.

### 3. Dr. Brian Cole, M.D.

Plaintiff argues that the ALJ erred in giving "partial weight" to Dr. Cole's February 8, 2016 consultative report and should not have given it any weight at all "against the later medical records and opinions of Plaintiff's physicians . . . ." (Pl.'s Br. at 22-23). Plaintiff argues that Dr. Cole saw plaintiff only once, only two months after his onset date, and 22 months prior to his stroke. (Pl.'s Br. at 23). Thus, Dr. Cole did not have all the relevant information "against the later medical records and opinions of Plaintiff's physicians" to determine plaintiff's condition. (*Id.*)

Dr. Cole's examination of the plaintiff showed essentially "[n]o [physical] restrictions based on today's findings." (T. 355). The report states that Dr. Cole did review an X-ray of plaintiff's lumbosacral spine, and conducted "strength testing." (*Id.*) All of Dr. Cole's findings were normal. If the ALJ had relied solely on Dr. Cole's MSS, she would not have limited plaintiff to a "reduced range of light work." Clearly, the ALJ considered the other, *later* evidence of record, including as stated above, the records of plaintiff's examinations, showing additional limitations after his 2017 stroke. Plaintiff is alleging a disability onset in December of 2015, and he did not have his stroke until 2017. The ALJ was required to consider all the evidence of record before and after plaintiff's stroke, including Dr. Cole's consultative opinion, and correctly gave it only "partial" weight due to the plaintiff's subsequently acquired limitations.

Although plaintiff argues that Dr. Cole's MSS can "hardly be consistent with the record," because he did not consider severe limitations contained in reports that had not been written at the time that he gave his opinion, the ALJ included many more

limitations in her RFC than were expressed in Dr. Cole's report.  In addition to Dr. Cole's February 2016 report, the ALJ considered other medical reports authored at the same time as Dr. Cole's examination.  The ALJ cited plaintiff's emergency room visit in January of 2016, during which he complained of lower back pain. (T. 113) (citing T. 833-47).  This report indicates that plaintiff's neurological examination was normal and his sensation was normal. (T. 838).  There was full range of motion in all extremities. (T. 839).  He had mild, diffuse tenderness in his lower, spine, but the findings were otherwise normal. (T. 838).

The ALJ cited another emergency room visit in September of 2016, in which plaintiff complained of bilateral paresthesias in his hands, but the results of the examination were normal, including full range of motion, normal sensation, and normal motor strength. (T. 113) (citing T. 887, 890, 899).  The ALJ cited treatment records from plaintiff's former treating internist Dr. Vecchio, dated January 2017, which cited complaints of lower intermittent back pain and extremity pain. (T. 113) (citing T. 512-13).  Dr. Vecchio found no point tenderness of plaintiff's back, "slightly" decreased AP flexion, and a normal gait. (T. 513).

The ALJ also reviewed evidence from examinations of September of 2017, February 2018, April 2018, May 2018, and June of 2018, all of which found normal or slightly diminished functional abilities with respect to plaintiff's back, his legs, and his hands/wrists. (T. 1169, 499, 798, 786, 1188).  Dr. Cole's 2016 MSS was also consistent with records dated February 24, 2017 and June 21, 2017 from Dr. Vecchio.  In February of 2017, Dr. Vecchio stated that plaintiff complained of depression, but found

"minimal" depression, "denied" leg cramps, and although plaintiff had a positive
Tinel's sign over the medial nerve bilaterally, he had full range of motion in his hands
and fingers and full strength in both hands. (T. 507-508).  In June of 2017, Dr. Vecchio
stated that plaintiff came to the office complaining of leg cramps.  However, the
physical examination of his back was normal, and his gait was normal. (T. 504-505).

During the September 29, 2017 examination by NP Burgess, she stated that
plaintiff had mild to moderate disc degeneration at L5/S1, with a central bulge, but no
significant stenosis. (T. 1169).  Plaintiff complained of cramping in his legs, but at that
time, a vascular work-up had been negative. (*Id.*)  NP Burgess stated that plaintiff was
not a candidate for disc fusion because he smoked, and she told plaintiff to quit
smoking because it made his pain "10x worse." (T. 1169).  She also noted that the back
pain was "intermittent and he does not meet radiographic criteria at this point." (*Id.*)
All the records cited by the ALJ are consistent with Dr. Cole's evaluation and
consistent with the ALJ's analysis.  While plaintiff may have had some additional
limitations due to the stroke, the ALJ was entitled to evaluate plaintiff's condition prior
to the stroke, and limited her reliance on Dr. Cole's findings accordingly by giving his
report only "partial weight."  Thus, plaintiff's argument that Dr. Cole should have been
given "no" weight because it was inconsistent with evidence of plaintiff's condition
after the stroke cannot succeed, and there was substantial evidence in the record,
justifying the weight that the ALJ gave to Dr. Cole's findings.

There is further support for the ALJ's analysis in the record.  The court notes that
in Dr. Vecchio's February 12, 2018 treatment note (post-stroke), she stated that she

29

asked the plaintiff to come in because of problems keeping his Protime[21] therapeutic.

(T. 498).  Plaintiff was belligerent and refused a caseworker.  Dr. Vecchio believed that

plaintiff was not taking his medications properly.  Plaintiff was argumentative, and

arrogant, refusing to bring his medicine bottles for the doctor to examine. (T. 499).  He

was annoyed that he had to come in for more blood tests.[22] (*Id.*) Plaintiff denied any

difficulty with his balance, and denied dizziness or fainting.  A physical examination of

his back showed full range of motion, "a normal spine exam," no cyanosis[23] or edema

of the extremities, strong pedal pulses, and normal gait. (*Id.*)  While there is no question

that plaintiff has limitations, the ALJ's analysis of the record evidence, including the

medical reports is supported by substantial evidence.

## VII.   EVALUATION OF SYMPTOMS

### A.    Legal Standards

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must

take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*,

606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence

presented by claimants regarding their symptoms, which fall into seven relevant factors

including 'daily activities' and the 'location, duration, frequency, and intensity of

---

[21] A Protime (Prothrombin Time) Test "measures how long it takes for a clot to form in a blood sample."  It also checks to see whether a medication that helps prevent blood from clotting is working properly. https://medlineplus.gov/lab-tests/prothrombin-time-test-and-inr-ptinr/

[22] Plaintiff testified that one of the reasons that he switched treating providers was that he did not like being called into the office for frequent blood tests. (T. 42-43).

[23] "Cyanosis is a bluish color of mucous membranes and/or skin," which is most often due to increased amounts of unoxygenated hemoglobin in the vasculature." https://www.ncbi.nlm.nih.gov/books/NBK367/.

[their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[24] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[25]  If the objective medical evidence does not substantiate the claimant's

---

[24] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

[25] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings.  The 2016 ruling has removed the emphasis on "credibility."

symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76.  However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)).  "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astru*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

**B.    Application**

Plaintiff argues that the ALJ did not properly analyze his complaints of pain and failed to provide a sufficient explanation of why his claims were "not entirely consistent with the medical evidence." (Pl.'s Br. at 24-25).  This court disagrees.  The

32

ALJ acknowledged plaintiff's claims and plaintiff's testimony at the hearing, but then stated that based on her subsequent analysis, the plaintiff's allegations were inconsistent with the medical evidence. (T. 112-15).

For example, the ALJ noted plaintiff's history of degenerative disc disease, carpal tunnel syndrome, hypertension, anemia, and stroke. (T. 113). The ALJ found that these conditions would limit the plaintiff's RFC to a "reduced" range of light work, but "when considering the relatively normal findings on objective examination despite the claimants less than full compliance with even routine and conservative treatment modalities, . . . the record does not support any greater limitations." (T. 113). The rest of the ALJ's discussion focused on the medical evidence, including normal examination results despite plaintiff's complaints, and plaintiff's statements to his physicians. (T. 113). The ALJ noted that during the consultative examination by Dr. Cole, plaintiff endorsed a history of back pain since 2010, but reported that he had not received any treatment and had been able to continue working until he was laid off for lack of business, not because of his medical condition. (T. 113).

The ALJ later noted that NP Burgess advised him to stop smoking in September 2017 because smoking made his pain much worse. (*Id.*) The ALJ also noted that plaintiff was discharged from physical therapy for non-compliance. (T. 113) (citing T. 1157-67). The discharge followed plaintiff's failure to attend several appointments. (*Id.*) The ALJ's analysis also included the inconsistencies in plaintiff's claims of mental impairments, which are not being challenged herein. Although not specifically citing them as "*Burgess*" factors, the ALJ covered most of the factors listed in *Burgess*

for determining the consistency of plaintiff's symptoms with the record as a whole.

In addition, a review of the record shows that even if the ALJ failed to mention a specific *Burgess* factor, her finding is supported by substantial evidence.  The court's review of the evidence shows that in the medical reports, plaintiff often denied the symptoms that he is claiming affect his ability to work.  Prior to plaintiff's stroke, he was referred to a hematologist, Dr. Marima Ramovic Zobic, M.D. because his hematocrit[26] was elevated. (T. 491-93).  During this May 15, 2017 examination, the plaintiff reported that he had no weakness or fainting spells, and informed the doctor that he had broken his wrist in a bar fight shortly prior to the examination.[27] (T. 491).  His blood test was normal, and the doctor stated that plaintiff's levels were possibly elevated due to dehydration, to which plaintiff replied that it "must have been after a night of drinking." (T. 493).  His physical examination showed that his wrist was healing, his cranial nerves were intact, he had normal muscle tone and power, and his sensory examination was also normal. (T. 492).

At the ALJ's hearing, plaintiff complained of urinary frequency and fecal problems after his stroke, but there are no complaints of such problems in a report written by Amishi Desai, M.D., dated January 29, 2018, to whom plaintiff was referred

---

[26] "A hematocrit . . . test measures the proportion of red blood cells in your blood. Red blood cells carry oxygen throughout your body. Having too few or too many red blood cells can be a sign of certain diseases." https://www.mayoclinic.org/tests-procedures/hematocrit/about/pac-20384728

[27] There are emergency room records, dated May 12, 2017, in which the provider stated that plaintiff was "currently intoxicated," was very vague, but "after much coaxing," he reported that he had punched someone earlier that day. (T. 1051).  Notwithstanding this incident, an examination revealed no numbness, tingling, or weakness, and his sensation and motor examinations were normal. (T. 1056). The x-rays revealed a metacarpal fracture, he was given a splint, and sent home. (T. 1063).

after his stroke (T. 480)[28] or in Dr. Visalli's June 21, 2018 treatment notes.[29] (T. 1186-89).   The court notes that, even in Dr. Cherukuri's restrictive MSS, he failed to circle "Bladder Problems" as one of plaintiff's current symptoms. (T. 1068).   Although not specifically listing each factor in the regulation by number, the ALJ covered all the appropriate reasons that plaintiff's allegations were not inconsistent with the medical evidence.   Thus the ALJ's analysis of plaintiff's symptoms is supported by substantial evidence.

## VIII.  Step Five Determination

### A.    Legal Standards

If the ALJ utilizes a VE at the hearing, generally, the VE is asked a hypothetical question that incorporates plaintiff's limitations. Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.   *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).   The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion." *Dumas*, 712 F.2d at 1554.   *See also Peatman v. Astrue*, No.

---

[28] In fact, Dr. Desai's review of symptoms indicates that plaintiff was not complaining of, inter alia, diarrhea, urinary frequency, or urgency. (T. 480).

[29] For the first time, plaintiff did report that he thought he fainted some days prior to the examination, but he did not wish to go to the hospital. (T. 1186).

5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

### B.    Application

Plaintiff argues that the ALJ's step five determination is not supported by substantial evidence because the VE was not asked a hypothetical question reflecting the full extent of plaintiff's impairments.  However, based on my findings above that the ALJ's RFC was supported by substantial evidence, the VE's testimony was based on the appropriate limitations, and the ALJ's step five determination is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is further

**ORDERED**, that judgment be entered for the **DEFENDANT**.

Dated:  November 24, 2020

Andrew T. Baxter
U.S. Magistrate Judge